DEBBIE LaMANNA *et al.*, Plaintiffs-Appellants, v. G.D. SEARLE AND COMPANY, Defendant-Appellee.

First District (3rd Division)  No. 1—88—2717

Opinion filed September 26, 1990.

Robert F. Lisco, of Lisco & Field, of Chicago (Sidney Z. Karasik, of counsel), for appellants.

Arlen C. Erlebacher and Barbara M. DeCoster, both of Sidley & Austin, of Chicago, for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff Debbie LaManna (plaintiff), brought a product liability action against defendant G.D. Searle & Company (defendant). The suit charges that plaintiff was injured and became infertile as a result of an infection caused by a CU-7 Intrauterine Copper contraceptive device (IUD), manufactured by defendant. Plaintiff's husband, Tom LaManna, joined in the suit as a plaintiff in a separate count for loss of consortium. The trial court applied the discovery rule for determining when the two-year limitation period for filing the action began to run, and entered summary judgment in favor of defendant on the ground that the action was time barred when filed. We reverse and remand.

On August 14, 1981, Dr. Jeffrey Johnson, a gynecologist, fitted plaintiff with the IUD. Prior to the insertion of the IUD, plaintiff was required to and did sign a consent form which stated: "Pelvic infection is reported more frequently among IUD users than non-users. In some cases this can result in infertility." Plaintiff did not discuss the consent form with Dr. Johnson and was not given any additional information relating to the consent form.

Approximately one year after the insertion of the IUD, plaintiff wished to become pregnant, and in August 1982, the IUD was removed by Dr. Johnson. During the one year or so that the IUD was used, plaintiff experienced no unusual symptoms other than somewhat heavier menstrual bleeding and cramps.

After the IUD was removed, plaintiff had discussions with some of her acquaintances who said that they were having trouble becoming pregnant and they believed that it was because they had used an IUD. Plaintiff was never told what kind of IUD her acquaintances had used. Several months after her IUD had been removed, plaintiff went to see

Dr. Jeffrey Lerch, a gynecologist and partner of Dr. Johnson, regarding her inability to become pregnant. Dr. Lerch told the plaintiff that he "felt that there was nothing to be concerned about; he felt that in most cases it takes a year, six months to a year for a woman to become pregnant; that there was nothing to be alarmed about."

During August 1983, plaintiff and her husband asked Dr. Lerch why she was still unable to become pregnant. Also, plaintiff mentioned to Dr. Lerch that some of her acquaintances who had used an IUD were experiencing problems conceiving, and she asked Dr. Lerch if her use of the IUD may have been responsible for her infertility. Dr. Lerch responded that "every case is different." At that time, plaintiff had no knowledge of anyone who had suffered permanent injury or infertility due to using an IUD.

At their meeting in August 1983, Dr. Lerch proposed a series of fertility tests. Also, a sperm test was taken and it was determined that plaintiff's husband was not the reason that plaintiff did not become pregnant. In October 1983, Dr. Lerch performed a test which showed that plaintiff's Fallopian tubes were blocked. On November 1, 1983, Dr. Lerch performed a laparoscopy to ascertain the extent of the blockage of the Fallopian tubes.

On November 22, 1983, plaintiff and her husband met with Dr. Lerch to discuss the results of the laparoscopy. At her deposition, plaintiff testified:

"Q. What did Dr. Lerch tell you about the results?

A. That the tubes were definitely blocked, they were crimped. That there was an infection, inflammatory infection. That if we left it like this, my chances of getting pregnant were really low. That if we did surgery, I would have a 50 percent chance.

Q. When he said low, did he give you a figure?

A. 20 percent.

Q. And was it your understanding that even if surgery was performed, it would still be just a 50/50 chance?

A. Yes.

Q. Did he tell you what had caused your tubes to become blocked?

A. Possibility the IUD had caused an infection. There was an infection.

Q. You also talked about in addition to them being blocked that they were crimped I think you said?

A. That would be like the same thing. They're blocked, they're crimped.

Q. So that was part of the same process?

A. Right.

Q. At this November 22, 1983 visit, did you discuss with Dr. Lerch how an IUD might have caused your tubes to be blocked?

A. No, just an infection. It causes an infection."

At his deposition, plaintiff's husband stated that Dr. Lerch said "the IUD could cause an infection." Plaintiff's husband further stated as follows:

"Q. Did he give you any information about how an IUD would cause an infection?

A. No, he did not."

Plaintiff underwent surgery on December 7, 1983, and the scar tissue was removed from her Fallopian tubes. After the surgery, Dr. Lerch told plaintiff that the surgery had gone well and that her chances of becoming pregnant had increased to 60% to 65%. Plaintiff, however, still did not become pregnant. As a result, in September 1985, plaintiff decided to consult a fertility specialist, Dr. Mariano Perez-Pelaez. At her deposition, plaintiff testified:

"Q. Have you had any conversations with Dr. Perez-Pelaez about the possibility that your infertility is caused by the IUD?

A. Yes.

Q. When do you recall the first such discussion?

A. The time we went to go see him and he had reviewed the records and stuff like that and he just came out and said that's why you are not getting pregnant, the IUD. You had an IUD.

Q. Was that the first visit with Dr. Perez-Pelaez?

A. First or second."

Dr. Perez-Pelaez performed surgery on the plaintiff in October 1985. When plaintiff was asked at her deposition if Dr. Perez-Pelaez told her what he found after the surgery, she stated:

"A. Yes, there was scar tissue still and I don't know the technical words, but there was a hard thing around the ovaries that he took, put holes in and it was draining, and he did that.

Q. Was this additional scar tissue that had built up since the last surgery, do you know?

A. Yes.

Q. Did you have any discussion with Dr. Perez-Pelaez about what was causing the problem with the ovaries, what was causing this hard cover to form?

A. No. He felt it was the IUD.

Q. Was that interfering with ovulation, was that your understanding?

A. Yes.

Q. Are you still seeing Dr. Perez-Pelaez today?

A. No.

Q. Are you seeing Dr. Miller?

A. Not at this time, no.

Q. For what period of time did you treat with Dr. Perez-Pelaez?

A. Five months, six months, something like that.

Q. After the surgery, what did Dr. Perez-Pelaez recommend that you do?

A. Go home and get pregnant.

Q. Did he prescribe any medication of any kind?

A. I don't think so. I don't really recall.

Q. Did he suggest that you take your temperature or do anything like that?

A. No.

Q. Why did you stop going to Dr. Perez-Pelaez?

A. He built my hopes up so high that I just didn't believe in him any more.

Q. Was that after the surgery you mean?

A. Right. After surgery he came up to me and said 100 percent. He said just go home and get pregnant. I don't even worry about you no [sic] more.

Q. How did you come to start seeing Dr. Miller, were you referred to him by somebody?

A. My husband knew about him.

Q. Do you know how your husband learned of him?

A. I think a friend had been to school with him and said that he was really good.

Q. When did you first start seeing Dr. Miller?

A. Some time in late '85.

PLAINTIFF'S ATTORNEY: No. Last visit with Perez-Pelaez would have been in '85, so probably '86.

A. '86, I'm sorry.

\* \* \*

Q. Has Dr. Miller indicated to you why he thinks you have been unable to become pregnant?

A. He speculated, you know, the IUD."

On February 13, 1986, plaintiff filed the present lawsuit, and her husband filed a count for loss of consortium. Defendant filed a motion for summary judgment on the ground that the action was time barred because it was not filed within two years after the plaintiff knew or

reasonably should have known that she was injured and that the injury was wrongfully caused.

When it entered summary judgment in favor of the defendant, the trial court stated:

> "THE COURT: All right. The parties do not dispute that this suit is governed by the statute of limitations in section[s] 13—202 and 13—203, providing for a two-year statute of limitations for the personal injury. Plaintiffs' cause of action for loss of consortium obviously must be commenced within the same period of time as the action as to the injury under 13—203. The real question here is whether the Court can state as a matter of law when the statute had commenced running. The implication of this motion, obviously, is to the discovery rule. The statute of limitations under a discovery rule concept begins to run when the plaintiff knows or reasonably should know of the injury and also knows or reasonably should know that it was wrongfully cause[d].
>
> * * *
>
> *** [T]here isn't any question of fact in that Debbie La-Manna was certainly possessed of sufficient information concerning her injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct was involved on and possibl[y] before November 22nd, 1983.
>
> It was the whole purpose for her going to see Dr. Lerch to inquire, and she did inquire. On that date, Dr. Lerch informed her of the possible connection between the IUD and the infection that she suffered.
>
> The statute of limitations at the very latest commenced running on that day as a matter of law. That means that the action filed by her is time barred. The defendant's motion for summary judgment is granted."

■ We disagree with the entry of summary judgment in favor of the defendant. Product liability actions must be filed within two years after "a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused." (*Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 171, 421 N.E.2d 864, 868; Ill. Rev. Stat. 1989, ch. 110, par. 13—202.) Here, the critical issues are (1) when the plaintiff reasonably should have known that her injury was wrongfully caused and (2) whether there is only one conclusion that can be drawn from the undisputed facts. The injury, for our purposes, is either the infection or the infertility.

Infections and infertility are commonplace. Neither has to be

wrongfully caused. Moreover, a foreign object, such as an IUD, in the body may cause an infection without there being anything wrong with the foreign object. Indeed, in the present case, prior to the insertion of the IUD, plaintiff was required to and did sign a consent form which warned that pelvic infections were a possible consequence of its use and that such infections could result in infertility. It was therefore made clear to the plaintiff that infection and infertility could be caused by the use of the IUD without being wrongfully caused. Moreover, in view of the consent form, it is a reasonable assumption that the position of the defendant is that an infection and infertility could be caused by the use of the IUD without being wrongfully caused.

■■ Under the circumstances, Dr. Lerch's statement to the plaintiff on November 22, 1983, that there was a "[p]ossibility the IUD had caused the infection," would not have imparted to the plaintiff knowledge that the infection was wrongfully caused. Plaintiff may very well have believed that the IUD may have possibly caused an infection but that the infection was idiosyncratic rather than wrongfully caused.

■■ In addition, we believe that plaintiff's actions prior to the November 22, 1983, meeting with Dr. Lerch merely indicate that plaintiff was attempting to discover the cause of her condition, without reasonably knowing that her condition was wrongfully caused. When one merely seeks to discover the cause of a condition, it does not mean that the person reasonably knows or reasonably should know that the condition was wrongfully caused.

■■ In reaching our conclusion, we do not suggest that the limitation statute is not triggered until a plaintiff gains actual knowledge of an actionable wrong or negligent conduct. (See *Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 416, 430 N.E.2d 976, 980.) It is obvious, however, that "when a party knows or reasonably should know that her injury was wrongfully caused" does not mean, "when a party is suspicious that her injury was wrongfully caused." Plainly, suspicion is not the same as reasonably knowing. Thus, the limitation statute is not triggered during the period that a party is attempting to discover whether her injury is wrongfully caused, but rather, it is triggered at the point when the party reasonably should have known that her injury was wrongfully caused.

■■ The point at which a party reasonably should have known that an injury was wrongfully caused is a question of fact, unless only one conclusion can be drawn at some particular point from undisputed facts. (*Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d at 171, 421 N.E.2d at 868-69.) In determining if there is some point when a party reasonably should have known that her injury was wrongfully caused as

matter of law, a court should not merely focus on a single statement. Rather, the determination must be made by considering all the circumstances that existed and occurred with respect to the statement, including the plaintiff's reaction or response and what the plaintiff did after hearing the statement. This is especially true when the transcript or document that is perused does not adequately reflect either the vein in which the statement was made or the reaction of the listener so that it is not clear what message was imparted. In addition, courts must bear in mind that unless a clear definitive diagnosis is given by a doctor, in many instances it is a compilation or a series of statements, events or circumstances and thoughts that changes mere suspicion to reasonably knowing that a patient's condition was wrongfully caused. This is especially true when the subject matter involves sensitive and delicate types of physical impairments such as female pelvic infections and infertility.

■ Also, in determining if there is some point when a party reasonably should have known that her injury was wrongfully caused as a matter of law, the court should bear in mind that it cannot presume that the plaintiff would sit on her rights. Rather, the pleadings, depositions and affidavits must be construed by the court most liberally in favor of the conclusion that the plaintiff did not sit on her rights. See *Aspegren v. Howmedica, Inc.* (1984), 129 Ill. App. 3d 402, 403-04, 472 N.E.2d 822, 824 (holding: "Summary judgment is appropriate only where the pleadings, depositions and affidavits, when construed most strongly against the movant and most liberally in favor of the opponent, show that judgment should be granted as a matter of law").

Moreover, the whole record must be considered to determine whether at some particular point the plaintiff reasonably should have known that her injury was wrongfully caused as a matter of law: Here, the record plainly shows that as late as October 1985, a fertility doctor, Dr. Perez-Pelaez, believed that plaintiff was not infertile, wrongfully caused or otherwise. In October 1985, Dr. Perez-Pelaez told the plaintiff: "Go home and get pregnant." He also said: "100 percent. *** [J]ust go home and get pregnant." Surely, as of that point in time we cannot say that plaintiff reasonably should have known that she was infertile if the fertility doctor believed that she was not infertile.

■ In the present case, since the action was filed on February 13, 1986, summary judgment should not have been entered unless the only conclusion that could be reached is that plaintiff knew or should have reasonably known that her injury was wrongfully caused more

than two years prior to February 13, 1986. Based upon a review of the record as a whole, we believe it is reasonable to conclude the plaintiff did not know and should not have reasonably known that her injury was wrongfully caused until sometime after her meeting with Dr. Perez-Pelaez in October of 1985. This conclusion is just as reasonable as the hypothesized conclusion that she knew or reasonably should have known that her injury was wrongfully caused on November 22, 1983, or sooner, as defendant claims and as found by the trial court as a matter of law. Since more than one conclusion may be drawn, the issue is one of fact to be determined by the trier of fact. Summary judgment, therefore, should not have been entered. *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 171-72, 421 N.E.2d 864, 869; *Ravin v. A.H. Robins Co.* (1989), 182 Ill. App. 3d 46, 57, 538 N.E.2d 164, 171.

Accordingly, the summary judgment in favor of the defendant is reversed and the case is remanded for further proceedings.

Reversed and remanded.

WHITE and FREEMAN, JJ., concur.