# Illinois Official Reports

## Appellate Court

---

### *Carlson v. Fish*, 2015 IL App (1st) 140526

---

| | |
|---|---|
| Appellate Court Caption | WILLIAM CARLSON and WILLIS CAPITAL, LLC, Plaintiffs-Appellants, v. DAVID J. FISH and THE FISH LAW FIRM, P.C., SHAWN M. COLLINS and THE COLLINS LAW FIRM, P.C., Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-14-0526 |
| Filed | April 22, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-7719; the Hon. Sanjay Tailor, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas C. Cronin, Leland W. Hutchinson, Jr., and Daniel J. Kelley, all of Cronin & Co., Ltd., for appellants.<br><br>John J. Duffy, Karen Kies DeGrand, and Michael J. Borree, all of Donohue Brown Mathewson & Smyth, LLC and Patrick M. Collins, of Perkins Coie, LLP, both of Chicago, for appellees. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Lavin concurred in the judgment and opinion. |

**OPINION**

¶ 1      The application of a statute of limitations, especially in legal malpractice claims, can be tricky and technical, and, as this case shows, deadly to those who fail to adequately anticipate its possibility. Plaintiff William Carlson sued his attorneys, David J. Fish and Shawn M. Collins, and their respective law firms, alleging legal malpractice in their representation of Carlson in a dispute with his former partners in an options trading firm. The underlying dispute was resolved through mediation and resulted in a settlement agreement in which Carlson agreed to sell his share of the firm to his former partners for $17.5 million. Not long after, Carlson came to believe his former partners may have defrauded him into accepting far less for his share of the firm than it was worth and began to investigate whether he might be able to sue his former partners for fraud.

¶ 2      In the course of Carlson's investigation, which included consultations with defendants and other law firms, as well as mediation and accounting firms, Carlson was advised that defendants' representation in his dispute with his former partners may have been substandard. On November 18, 2010, two years and nine months after the mediation and two years and two months after he began to investigate his fraud claims, Carlson sued defendants for legal malpractice seeking damages in excess of $20 million.

¶ 3      Defendants filed a motion to dismiss on statute of limitations grounds. While the motion was pending, Carlson voluntarily dismissed the complaint. Carlson refiled the one-count complaint and defendants again filed a motion to dismiss arguing that Carlson's complaint was barred by the applicable two-year statute of limitations for legal malpractice actions under section 13-214.3(b) of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/13-214.3(b) (West 2012)). The circuit court granted the motion, finding that Carlson knew of his injury and had identified his former partners as the wrongful cause more than two years before he filed his complaint against defendants. Carlson contends the trial court erred because (i) no evidence indicated he knew or should have known more than two years before filing his complaint that his former partners had wrongfully caused him injury, and (ii) he timely filed the complaint as he did not know he had a legal malpractice claim until another law firm informed him of it. Alternatively, Carlson contends defendants engaged in fraudulent concealment by failing to disclose that he might have a negligence claim against them, triggering a five-year statute of limitation under section 13-215 of the Code (735 ILCS 5/13-215 (West 2012)).

¶ 4      We affirm. Carlson's pleadings, including his response brief and affidavit, as well as his email correspondence with defendants, establish that he knew more than two years before he filed his complaint that he had been wrongfully injured by his former partners, which sufficiently triggered the statute of limitations on his legal malpractice claim against defendants. Further, Carlson fails to make a claim of fraudulent concealment to assert a five-year statute of limitations.

¶ 5                                  BACKGROUND

¶ 6      In 2002, William Carlson, with two partners, Owen O'Neill and Thomas Hutchinson, founded Belvedere Trading, LLC, an options trading company. (Carlson owned his interest in Belvedere through Willis Capital, LLC, a wholly owned limited liability company that is also a plaintiff in this case. Both will be referred to collectively as "Carlson.") Carlson was the sole managing member and held about a 62% membership interest; O'Neill held about a 25%

interest and Hutchinson held the remaining 13% interest. By 2004, O'Neill and Hutchinson were managing members and owned an equal 33.3% interest along with Carlson. Between 2004 and 2006, Carlson took a break from actively trading with the firm, and the partners revised their operating agreement to reflect Carlson's absence, including a redistribution of company profits in favor of the active trading partners, O'Neill and Hutchinson.

¶ 7 In 2006, a few months after Carlson returned to active trading for Belvedere, he had a falling out with O'Neill and Hutchinson over numerous issues, including profit distribution and management. Carlson retained Shawn Collins and David Fish of the Collins Law Firm to represent him in the dispute. (David Fish later formed the Fish Law Firm while continuing to represent Carlson. Defendants will be collectively referred to as "Collins.") In 2007, Collins, on Carlson's behalf, filed a request for arbitration with the Chicago Board of Options Exchange. Collins also filed a complaint for injunctive relief in the Cook County circuit court, seeking to dissolve Belvedere and compel it to buy his interest for fair value under section 35-60 of the Illinois Limited Liability Company Act (805 ILCS 180/35-60 (West 2012)).

¶ 8 In February 2008, Carlson, Hutchinson, and O'Neill agreed to mediate their dispute. The partners agreed that the mediation would be principals only, would be nonbinding, and would be supervised by mediator Douglas Gerrard. Carlson did not obtain an independent appraisal of his interest in Belvedere before the mediation, but in an email to Collins, he estimated that by the end of 2009, the company could be sold for $100 million. The mediation, held on February 13, 2008, resulted in Carlson agreeing to sell his interest in Belvedere for $17.5 million. The three owners signed a document that day delineating the terms of the sale, which were memorialized in a settlement agreement signed on March 6, 2008.

¶ 9 About six months after the mediated settlement, Carlson began communicating with defendants about his dissatisfaction with the amount he had received for his interest. Beginning in September 2008, Carlson sent numerous email messages to Shawn Collins expressing his frustration and his belief that his former partners had tricked him into taking less money than he should have and may have engaged in fraud. In a September 18, 2008 email message to Collins, Carlson wrote:

> "This email shows I thought I needed [$20 million] about my capital account *** I just wasn't comfortable yet without having gone over the numbers enough. You see, the mediation was to be filled with tricks referencing all sorts of stuff over the 9 month period filled with distractions (2 guys versus 1 guy) *** I had to defend my case against ghosts. [Mediator] Gerrard was confused by the excess of numbers they were distracting him with *** and wasn't asking me much when I was in the room alone after their 90 minute session.
>
> The bottom line is: their ploy was to confuse before the *** mediation. They sent a bunch of emails on Sunday and Monday regarding options inventory and confidentiality. *** Delay and distract. Thus, I didn't review and rehearse the numbers with you guys enough (there is no one else familiar with the case I could review the numbers with) ***."

¶ 10 In a reply sent later that day, Shawn Collins told Carlson he had made a good deal, stating, "Whenever you are tempted to beat yourself up for not getting a better deal at mediation, remember that it could have very easily been MUCH worse."

¶ 11 Carlson sent Shawn Collins and David Fish an email on October 9, 2008, inquiring about "any legal options" he might have pertaining to his settlement and any possible appeals

process. After acknowledging that he was not coerced or forced to sign the agreement, Carlson expressed regret at having "sold my founding stake in an explosive business" and recounting his numerous conversations with his accountant who "asked how this happened."

¶ 12 Shawn Collins responded by email advising Carlson that, as they had already discussed, the settlement could be set aside if procured by fraud and asking Carlson for any information along that line, "*i.e.*, something important about the company that was known to your partners pre-settlement, but not to you." He also noted that having had several conversations with Carlson about "your displeasure with the settlement, *** I'm not sure that I have anything more to add."

¶ 13 In an email dated November 4, 2008, Carlson informed Shawn Collins he had consulted with three different law firms, two mediation firms, and one accounting firm about the settlement. He also inquired whether he had any recourse based on new information he learned about his former partners' conduct before the mediation. On November 11, 2008, Carlson emailed Shawn Collins questioning whether certain provisions in the settlement agreement precluded him from bringing a fraud case against his former partners even if they had made false representations during the mediation. And, in a November 13, 2008 email exchange, Carlson and Shawn Collins discussed how to go forward with a fraud case. Carlson stated, "We need a plan" and presented some "thoughts/reflections *** to get us in the right direction." In response, Shawn Collins presented issues that would need to be addressed if Carlson opted to pursue a fraud claim against his former partners, including determining contingency fee. He further stated:

"I don't know if a 'fraud' case can be brought in a court, as opposed to arbitration. I'll look into it as soon as I am sure that you want to go forward, and go forward with me. On that note, you've referenced a couple of times recently the possibility of you working with another lawyer, perhaps in addition to me, or otherwise. You need to do what you feel is best for you, Bill. If you want to work with another lawyer, you should. No hard feelings. I'd like to be the one to help you, if there is anything legally to be done here. But only you can decide whether you want to go forward, and with whom."

¶ 14 That same day, Carlson responded, stating:

"I think you're a great man. I think you're a great attorney. But, this Arbitration arrangement has cost our side millions. I can't begin to count what *** and how much that mediation cost. How am I expected to live with 2 dumb-ass 25 yr olds standing in my trading spots and using the technology from the company I founded. How about dealing with the deception that has gone on for a long time. No sharing of development info is a huge deal *** and something I stressed from the start.

How is someone like me supposed to tolerate my life being given away. No technology, wrong buyout amount, no spots. Game over. Cavalier Mediator. Sickening. Maybe a fair fight when I'm ready to go *** instead of the slow drain over 8 months that is sure to affect one's judgment. What resulted is not easy to swallow."

¶ 15 Carlson also suggested that if Collins represented him, he might need co-counsel with experience in the areas, stating, "This may have helped us in Round 1."

¶ 16 On November 19, 2008, as part of his ongoing investigation, Carlson met with attorneys from the law firm of Drinker, Biddle & Reath, LLP. Carlson contends that while discussing a possible fraud claim against his former partners he was first made aware of a possible claim

against Collins when the Drinker lawyers raised questions about whether Collins' legal services in connection with the settlement agreement had been substandard.

¶ 17    On November 18, 2010, just less than two years following his meeting with the Drinker lawyers, Carlson filed his initial legal malpractice complaint against Collins. After Collins filed a motion to dismiss on statute of limitations grounds, Carlson voluntarily dismissed the complaint. Carlson refiled the complaint on July 5, 2013, alleging, in part, that defendants breached their professional duties by: (1) failing to obtain an independent appraisal of Belvedere's value before the mediation session; (2) permitting him to attend the mediation session without an attorney present; (3) advising him to sign the settlement agreement without any changes; and (4) failing to protect him from a fraud that his former partners were perpetuating.

¶ 18    On August 28, 2013, defendants filed a motion to dismiss under section 2-619(a)(5) of the Code (735 ILCS 5/2-619(a)(5) (West 2012)), arguing that Carlson's complaint was barred by the applicable two-year statute of limitations for legal malpractice actions. 735 ILCS 5/13-214.3(b) (West 2012). Carlson filed a memorandum in opposition to the motion to dismiss and attached an affidavit stating that in September and October 2008, he began to "consider how [he] had been defrauded by his former partners." His affidavit further stated that by November 4, 2008, he was "building a case for fraud against my former partners," on November 11, 2008, he shared with Collins his "continued ideas about going forward" with the fraud case against his former partners, and on November 13, 2008, he told Collins that his former partners' conduct "amounts to nothing less than '[c]heating–this whole thing is the biggest lie I've ever witnessed.' " Carlson also averred that he was not aware of any potential malpractice case against defendants until his November 19, 2008 meeting with the Drinker lawyers.

¶ 19    After a hearing, the trial court granted defendants' motion to dismiss with prejudice, finding that the cause of action accrued when Carlson knew he had been injured, which was no later than September 2008 and had identified his former partners as the cause, which was no later than November 12 or 13, 2008. Because Carlson's complaint was filed on November 18, 2010, more than two years after it had accrued, the circuit court found it was time-barred under section 13-214.3(b) of the Code (735 ILCS 5/13-214.3(b) (West 2012)).

¶ 20                                    ANALYSIS
¶ 21                              Statute of Limitations
¶ 22    Carlson first contends the circuit court erred in dismissing his legal malpractice complaint on statute of limitations grounds. Section 2-619(a) of the Code allows for the involuntary dismissal of an action that "was not commenced within the time limited by law." 735 ILCS 5/2-619(a)(5) (West 2012). Whether a cause of action was properly dismissed under section 2-619(a)(5) of the Code based on the statute of limitations is a matter we review *de novo*. *Ferguson v. City of Chicago*, 213 Ill. 2d 94, 99 (2004).

¶ 23    Section 13-214.3(b) of the Code states that an action for legal malpractice must be filed within two years "from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2012). This statute of limitations incorporates the discovery rule, "which delays commencement of the statute of limitations until the plaintiff knows or reasonably should have known of the injury and that it may have been wrongfully caused." *Dancor International, Ltd. v. Friedman,*

*Goldberg & Mintz*, 288 Ill. App. 3d 666, 672 (1997). Significantly, actual knowledge of the alleged malpractice is not a necessary condition to trigger the running of the statute of limitations. *SK Partners I, LP v. Metro Consultants, Inc.*, 408 Ill. App. 3d 127, 130 (2011) ("under the discovery rule, a statute of limitations may run despite the *lack* of actual knowledge of negligent conduct" (emphasis in original)). A statute of limitations begins to run when the purportedly injured party "has a reasonable belief that the injury was caused by wrongful conduct, thereby creating an obligation to inquire further on that issue." *Dancor*, 288 Ill. App. 3d at 673. Knowledge that an injury has been wrongfully caused "does not mean knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action." (Emphasis and internal quotation marks omitted.) *Castello v. Kalis*, 352 Ill. App. 3d 736, 744 (2004). A person knows or reasonably should know an injury is "wrongfully caused" when he or she possesses sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. *Hoffman v. Orthopedic Systems, Inc.*, 327 Ill. App. 3d 1004, 1011 (2002). The law is well settled that once a party knows or reasonably should know both of his injury and that it was wrongfully caused, "the burden is upon the injured person to inquire further as to the existence of a cause of action." (Internal quotation marks omitted.) *Castello*, 352 Ill. App. 3d at 745. "For purposes of a legal malpractice action, a client is not considered to be injured unless and until he [or she] has suffered a loss for which he [or she] may seek monetary damages." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005).

¶ 24    Carlson asserts that beginning in September 2008, he suspected that his former partners had procured the settlement agreement through fraud and commenced an investigation that extended until November 2008. He contends, however, that suspicion does not trigger the statute of limitations and he did "know or have reason to know" that he had been injured or that his injury had been wrongfully caused until November 19, 2008, when he met with attorneys from Drinker, Biddle & Reath. Carlson relies on *LaManna v. G.D. Searle & Co.*, 204 Ill. App. 3d 211 (1990), and *Young v. McKiegue*, 303 Ill. App. 3d 380 (1999), to support his argument that the discovery rule was not triggered while he was investigating whether he had a claim against his former partners.

¶ 25    In *LaManna*, the plaintiff alleged she became infertile because of an infection caused by defendant's contraceptive device. In reversing the trial court's summary judgment order in defendant's favor, the trial court held the statute of limitations begins to run at the point when the party reasonably should have known that an injury was wrongfully caused and not when a party is suspicious or attempts to discover whether the injury is wrongfully caused. *LaManna*, 204 Ill. App. 3d at 218.

¶ 26    Carlson contends that, as in *LaManna*, he only suspected that his injury was wrongly caused and was still in the process of investigating possible fraud by his former partners up until his meeting with the Drinker lawyers on November 19, 2008. We disagree with Carlson's contention. First, *LaManna* is distinguishable and does not support Carlson's argument. In *LaManna*, the plaintiff was not investigating to determine what the wrongful cause of her injury was, but whether she was injured and whether there was any wrongful cause at all. It was possible the plaintiff was not infertile, as one doctor told her or that her infertility was caused by something other than the contraceptive device. Conversely, Carlson believed not long after entering the settlement agreement that his partners may have engaged in fraud

during the negotiation and that any injury he suffered, namely the difference between what he received for his share of the company and what that share was worth, directly resulted from the alleged fraud. Moreover, contrary to Carlson's assertions, the *LaManna* court did not deviate from precedent regarding the discovery rule. *LaManna*, 204 Ill. App. 3d at 218.

¶ 27 Similarly, *Young v. McKiegue*, 303 Ill. App. 3d 380 (1999), fails to support Carlson's argument because there the statute of limitations was tolled while the plaintiff investigated whether her injury–her husband's death in the hospital–was wrongfully caused. Until two medical experts reviewed her husband's medical records and determined that the physicians caring for her husband had deviated from the standard of care, she did not know or have reason to know that her injury was wrongfully caused. *Id*. at 389.

¶ 28 Defendants maintain that Carlson made several judicial admissions showing that he knew he had been wrongfully injured more than two years before he filed his legal malpractice complaint. They also assert that email correspondence between Carlson and Collins starting in September 2008 supports a finding that Carlson failed to satisfy the statute of limitations.

¶ 29 As to judicial admissions, defendants point to Carlson's statement in his response brief to the motion to dismiss that before November 19, 2008, he "may well have believed that Belvedere cheated him as part of the settlement." Further, in an affidavit attached to that brief, Carlson stated that on November 11, 2008, he told defendants he was "thinking about a fraud case" against his former partners and on November 13, 2008, told them that his former partners' conduct at the mediation amounted to nothing less than "cheating." Lastly, defendants point out that during oral argument on the motion to dismiss, the trial judge asked the following question of Carlson's attorney:

> "THE COURT: Your position is that although the plaintiff knew of his injury, let's say, as late as November 13th, and also knew on that date that his injury had wrongfully been caused because his former partners had defrauded him, the cause of action as to his lawyers would not have accrued on that date because he did not know his injuries were wrongfully caused also by his lawyers. Would that be a fair characterization of your position?
>
> CARLSON'S ATTORNEY: I think that's fair. What I am saying is the cause of action did not accrue because he was–the cause of action against his lawyers did not accrue because the standard in *Jackson*, *Jordan*, *Mitsias*, elsewhere, is that, as *Mitsias* says, there has to be some awareness of some possible fault on the part of the defendant in question. *** Awareness of misconduct of the lawyers."

¶ 30 Defendants contend these statements constitute judicial admissions that preclude Carlson from now arguing that he did not know until November 19, 2008 that he had been wrongfully injured.

¶ 31 Judicial admissions are formal admissions in the pleadings that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. *Konstant Products, Inc. v. Liberty Mutual Fire Insurance Co.*, 401 Ill. App. 3d 83, 86 (2010). For a statement to constitute a judicial admission, it must be clear, unequivocal, and uniquely within the party's personal knowledge. *Williams Nationalease, Ltd. v. Motter*, 271 Ill. App. 3d 594, 597 (1995). The statement also must be an intentional statement relating "to concrete facts and not an inference or unclear summary." *Serrano v. Rotman*, 406 Ill. App. 3d 900, 907 (2011). Evidentiary admissions can be controverted or explained by the party, while judicial

admissions cannot be controverted or explained. *Pryor v. American Central Transport, Inc.*, 260 Ill. App. 3d 76, 85 (1994).

¶ 32    We agree with Collins that Carlson's statements in his response brief and his attached affidavit constitute admissions that he knew before November 19, 2008, that he had been wrongfully injured by his former partners. Carlson explicitly stated in his response brief that before November 19, 2008, he "may well have believed that Belvedere cheated him as part of the settlement." Further, as noted, in his affidavit, Carlson stated that in September and October 2008, he began to "consider how [he] had been defrauded by his former partners" and by November 11, 2008, was "thinking about a fraud case" against his former partners.

¶ 33    This finding is further supported by the email exchange between Carlson and defendants beginning in September 2008, in which Carlson expressed his dissatisfaction with the results of the mediation and raised concerns that his former partners had engaged in fraud to induce him into signing the settlement agreement. In his September 18, 2008 email to Shawn Collins, Carlson stated that his former partners' "ploy was to confuse" and to "delay and distract" and that they were trying to confuse the mediator with an excess of numbers. He continued to investigate through October and by November 4, 2008, was building a case for fraud against his former partners. By November 13, 2008, Carlson had concluded that his former partners' conduct amounted to "no less than cheating" and solicited ideas from Collins about a plan for going forward with a fraud case. Although Carlson asserts that it was not until the November 19, 2008 meeting with the Drinker lawyers that he knew he had been wrongfully injured, it is evident he knew weeks, if not months, in advance of that date.

¶ 34    Carlson contends, however, that even if he knew or should have known before November 19, 2008, that he had been injured by his former partners, his legal malpractice claim was timely because he did not know until he met with the Drinker lawyers that defendants were at least partly responsible for his injuries. For support, Carlson cites *Mitsias v. I-Flow Corp.*, 2011 IL App (1st) 101126, and *Hochbaum v. Casiano*, 292 Ill. App. 3d 589 (1997). In *Mitsias*, following shoulder surgery, the plaintiff experienced severe shoulder pain and was diagnosed with chondrolysis, a condition that causes destruction of cartilage. *Mitsias*, 2011 IL App (1st) 101126, ¶ 6. The plaintiff sued the surgeon and the hospital where the surgery occurred, alleging medical malpractice. *Id*. ¶ 7. Later, during the deposition of one of her physicians, the plaintiff learned six years after her surgery that research had uncovered a link between the pain pump used during her surgery and cartilage destruction. *Id*. ¶ 8. Plaintiff voluntarily dismissed her complaint and refiled, adding product liability claims against the pain pump manufacturer. *Id*. ¶ 10. The trial court granted the product liability defendants' motions to dismiss plaintiff's complaint as untimely, finding that the statute of limitations on the medical malpractice claim and the products liability claim commenced at the same time, when plaintiff knew she had been injured and that the injury had been wrongfully caused. *Id*. ¶ 14.

¶ 35    The appellate court reversed, finding that the plaintiff had not slumbered on her rights because "there is no question that plaintiff could not have known of any potential products liability cause of action against the pain pump manufacturers while the causal link between her injury and the pain pump used upon her was not scientifically discoverable. As has been discussed, our supreme court has expressed concern that plaintiffs should not be " 'held to a standard of knowing the inherently unknowable.' " *Id*. ¶ 29 (quoting *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 171 (1981)).

¶ 36    In *Hochbaum*, also cited by Carlson, the plaintiff brought a medical malpractice action against her treating physicians and a products liability action against Prozac manufacturers seeking damages for personal injuries she sustained when she attempted suicide while being treated with Prozac. *Hochbaum*, 292 Ill. App. 3d at 591. The trial court granted summary judgment in defendants' favor because plaintiff's complaint was not filed within the two-year limitations period applicable to medical malpractice and products liability actions. *Id*. at 593. The appellate court reversed, finding that the plaintiff did not learn about a possible connection between Prozac and suicidal behavior until she heard about it in the news media 18 months after her suicide attempt. *Id*. at 595.

¶ 37    Carlson argues that as in *Mitsias* and *Hochbaum*, his knowledge that he had a fraud claim against his former partners did not mean he knew that he also had a separate legal malpractice claim against his former lawyers. Further, because he is not a lawyer he contends he was not equipped to discern that his lawyers may have committed malpractice until he obtained independent legal advice from the Drinker lawyers.

¶ 38    We disagree. First, unlike in *Mitsias* and *Hochbaum*, where the claims were unknown until uncovered by scientific research or a news report, Carlson's claim for legal malpractice against his lawyers was not "unknowable." While investigating whether his former partners had engaged in fraud during mediation, he could certainly have tried to determine whether his legal representation in that proceeding was substandard. Indeed, that is what he eventually did, when he met with the Drinker lawyers. The fact that he waited until November 19, 2008, to have that meeting does not mean that day initiated his cause of action against Collins. Further, the trail of emails between Carlson and defendants shows that Carlson was not happy with his attorneys' representation in the mediation before his meeting with the Drinker lawyers. For instance, Carlson's November 13, 2008, email message to Collins suggesting that co-counsel with experience in the options market might have been helpful during the mediation is evidence that by that date, Carlson knew that defendants may have failed to provide adequate legal representation. Unlike the injury in *Mitsias*, which was scientifically unknowable, Carlson's claim against defendants was knowable and known by Carlson before November 18, 2008.

¶ 39    More importantly, as stated already, knowledge that an injury has been wrongfully caused "does not mean knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action." (Emphasis and internal quotation marks omitted.) *Castello*, 352 Ill. App. 3d at 744. Carlson knew that he had been wrongfully injured no later than November 13, 2008, and thus even though he may not yet have known that defendants' representation was partly responsible and that their conduct gave rise to a legal malpractice cause of action, the statute of limitations commenced because Carlson did have knowledge that he was injured and that his injury was wrongfully caused. In short, Carlson's identification of one wrongful cause of his injuries initiates his limitations period as to all other causes, particularly when, as here, he claims his partners engaged in fraud and the defendants failed to protect him from fraud, those claims are inseparable.

¶ 40    *Blue Water Partners, Inc. v. Mason*, 2012 IL App (1st) 102165, is illustrative. In *Blue Water*, the plaintiffs sued their former partners alleging, among other claims, wrongful diversion of business opportunities and breach of promise. *Id.* ¶ 16. In short, the plaintiffs alleged that their business partners improperly formed a company to directly compete with the company plaintiff and defendants had formed earlier. *Id.* ¶ 17. The trial court ruled in defendants' favor, finding that plaintiffs extinguished their claims against defendants when

both parties signed a series of documents releasing the other from all claims. *Id.* ¶ 18. Plaintiffs then sued their attorneys alleging they committed legal malpractice by assisting defendants in creating the competing company. *Id.* ¶ 23. The trial court found that the legal malpractice claim was time-barred because at the time plaintiffs signed the release they knew or should have known that defendants engaged in purportedly wrongful conduct by helping plaintiffs' former partners incorporate the competing company. *Id.* ¶ 32. In affirming the trial court, the appellate court held that the limitations period on plaintiff's claim against his lawyer commenced at the same time as his claim against his former partner because the two claims were inseparable. *Id*. ¶ 67.

¶ 41    Carlson's knowledge of a wrongful cause of his injury, even in if he had only identified his former partners' fraud as that cause, rather than defendants' failure to protect him from that fraud, commenced the two year statute of limitations. Because that date occurred no later than September 13, 2008 (and more likely even sooner), Carlson's complaint, filed on November 18, 2010, was not timely. Thus, the trial court did not err in granting defendants' motion to dismiss.

¶ 42                                         Fraudulent Concealment

¶ 43    Carlson contends, for the first time, that defendants fraudulently concealed that their own legal malpractice may have contributed to Carlson's injuries, triggering a five-year statute of limitations under section 13-215 of the Code. 735 ILCS 5/13-215 (West 2012). As a preliminary matter, we address defendants' contention that Carlson has waived this issue by failing to properly plead it in his complaint or raise it in his response to defendants' motion to dismiss. This court has consistently held that issues not raised before the circuit court are forfeited and cannot be raised for the first time on appeal. See *Eagan v. Chicago Transit Authority*, 158 Ill. 2d 527, 534 (1994). Although Carlson did not raise the fraudulent concealment issue in his complaint or in his response to defendants' motion to dismiss, during the hearing on defendants' motion to dismiss, Carlson's lawyer did argue that defendants had "lulled" Carlson by telling him he made a good settlement, which precluded him from knowing he might have a claim of legal malpractice. Thus, we will address the issue.

¶ 44    Under the fraudulent concealment doctrine, the statute of limitations will be tolled if the plaintiff pleads and proves that fraud prevented discovery of a cause of action. *Clay v. Kuhl*, 189 Ill. 2d 603, 613 (2000). If the fraudulent concealment doctrine applies, a plaintiff can commence her suit at any time within five years after she discovers she has a cause of action. 735 ILCS 5/13-215 (West 2012). As a general matter, one alleging fraudulent concealment must " 'show affirmative acts by the fiduciary designed to prevent the discovery of the action.' " *Clay*, 189 Ill. 2d at 613 (quoting *Hagney v. Lopeman*, 147 Ill. 2d 458, 463 (1992)). In other words, a claimant must show "affirmative acts or representations [by a defendant] that are calculated to lull or induce a claimant into delaying filing his [or her] claim or to prevent a claimant from discovering his [or her] claim." *Barratt v. Goldberg*, 296 Ill. App. 3d 252, 257 (1998). But there is a widely recognized exception to this rule in cases where the existence of a fiduciary relationship is plainly established. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 76 (2006) (citing *Crowell v. Bilandic*, 81 Ill. 2d 422, 428 (1980)). "[A] fiduciary who is silent, and thus fails to fulfill his duty to disclose material facts concerning the existence of a cause of action, has fraudulently concealed that action, even without affirmative acts or representations."

(Emphasis omitted.) *Id.* at 77. Our supreme court has recognized that an attorney-client relationship constitutes a fiduciary relationship. *Id.* (and cases cited there).

¶ 45 Carlson asserts that instead of advising him that he might have a claim of legal malpractice against them for failing to protect him from his former partners' fraudulent conduct, defendants reassured him that the settlement agreement was good under the circumstances and could have been much worse. Carlson also argues defendants failed to advise him of their conflict of interest and the possibility that their representation might be materially limited by their personal interests. Carlson's reliance on *DeLuna* for the proposition that defendants had a duty to affirmatively advise him to pursue a legal malpractice action against them is misplaced. In *DeLuna*, the plaintiffs alleged that their attorney misled them by telling them that their underlying medical malpractice case was going well when it had, in fact, been dismissed, and failed to disclose material facts bearing on the procedural status of the case. *DeLuna*, 223 Ill. 2d at 79-80. Moreover, the plaintiffs alleged that they could not speak English and that they relied in good faith on their attorney's reassurances. *Id.* at 80-81. Carlson fails to cite a case holding that a lawyer has an affirmative obligation to advise a client to sue the attorney for legal malpractice.

¶ 46 We also reject Carlson's contention that he was "lulled" by defendants into thinking that his only option was a fraud case against his former partners. Carlson consulted with three law firms, two mediation firms, and an accounting firm between September and November 2008, and was not solely reliant on defendants and their advice in determining how to remedy his injury. And when Carlson informed Collins he was leaning toward filing a claim of fraud against his former partners, Collins advised Carlson that if he wanted to work with another lawyer, he should. Thus, absent evidence of fraudulent concealment, a five-year statute of limitations does not apply.

¶ 47                                    CONCLUSION

¶ 48 Because Carlson failed to timely file his legal malpractice complaint, we affirm the circuit court's order granting defendants' motion to dismiss with prejudice.

¶ 49        Affirmed.