2023 IL App (1st) 211567-U

SECOND DIVISION
August 8, 2023

No. 1-21-1567

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| TAMMY SOPPER SEGOVIA, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | No. 18-L-12007 |
| GEORGE SPELLMIRE and SPELLMIRE LAW FIRM, | ) | |
| LLC, an Illinois limited liability company, | ) | Honorable |
| | ) | Thomas Mulroy |
| Defendants-Appellees. | ) | Judge Presiding |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1        *Held*: Reversed. Court erred in granting summary judgment in malpractice claim. Record showed that underlying lawsuit was not time-barred.

¶ 2        In 2018, Plaintiff Tammy Segovia filed a legal malpractice claim against George Spellmire and his law firm (the Spellmire defendants) after they failed to file an action (itself a legal malpractice claim) against plaintiff's former attorney. The Spellmire defendants moved for summary judgment, arguing that plaintiff's claim against her former lawyers would have been time-barred, and thus even if defendants were negligent in failing to file that action, their negligence did not proximately cause plaintiff any injury. The circuit court agreed and ruled that

plaintiff knew or should have known of her underlying claim no later than 2011, meaning it was time-barred before she ever contacted the Spellmire defendants.

¶ 3    We reverse. The record at this stage reveals that, while plaintiff may have known she was "injured" in 2011, she did not know of her injury's "wrongful cause" until far later—far enough later that a lawsuit against plaintiff's former attorney would not have been time-barred when the Spellmire defendants represented her. We remand for further proceedings.

¶ 4                                    BACKGROUND

¶ 5    There is very little dispute about the facts relevant to our review of this case. Any complexity in the facts is merely a reflection that this is a legal malpractice action against a law firm for not filing a legal malpractice against a second law firm for alleged negligent representation. In a nutshell, this case concerns the performance of three lawyers or firms who represented plaintiff Tammy Segovia:

- Attorney Yvonne Del Principie, who drafted a trust for her in 2004;

- The law firm of Much Shelist, on whose (allegedly negligent) advice plaintiff revoked the 2004 trust in 2011; and

- The Spellmire defendants, who in 2015 investigated a potential malpractice claim against Much Shelist but (allegedly negligently) did not file one.

Plaintiff's theory is that Much Shelist provided negligent representation when it revoked the 2004 trust, and the Spellmire defendants should have helped plaintiff sue Much Shelist for malpractice. Instead, the Spellmire defendants themselves committed malpractice by not doing so and allowing the limitations period against Much Shelist to expire.

¶ 6    Now to the detail. In 2004, plaintiff bought a house with her then-boyfriend Andrew Kulik (the Deming Property). About a month later, plaintiff hired attorney Yvonne Del Principie

to draft a trust. This trust was intended to memorialize the couple's agreement that, if plaintiff and Kulik were to marry and later divorce, plaintiff would have sole ownership of the Deming Property in return for reimbursing him for his contribution to the mortgage (the 2004 Trust). Less than a year after purchasing the Deming Property, the two married.

¶ 7       Fast forward to 2011: after plaintiff and Kulik had a child, the couple retained Much Shelist to prepare an estate plan. One of the principal purposes was to protect their assets in the event of liability for medical malpractice claims against Kulik, a physician. As part of that process, plaintiff gave Much Shelist a copy of the 2004 Trust. As plaintiff and Kulik were preparing to finalize the estate documents, their Much Shelist attorney told plaintiff there was a problem with the 2004 Trust. According to plaintiff, her lawyer said: "By the way, this trust will not hold up in court. And this trust is not wor[th] anything. And I've even talked to the partners here at Much[] Shelist about this, and they suggest that we just revoke the trust."

¶ 8       In that moment, plaintiff "just was kind of dumbfounded, probably broke out into a sweat, thinking I'm a total idiot, that whoever—whichever attorney, which I know which attorney I used, um, to do the trust, I must of used a ridiculous attorney, and how did I do this." But despite this feeling, the couple revoked the 2004 Trust on advice of counsel. In its place, they executed an estate plan which no longer protected plaintiff's sole ownership of the Deming Property (the 2011 Trust).

¶ 9       As plaintiff later explained in her deposition, "I knew that the 2004 Trust was being revoked" in 2011. She "kn[e]w revoking a trust, what that meant. And that I was screwed, basically." She "didn't know exactly what was happening, but I know that it was revoked, and whatever I had planned for the Deming house was not going to happen."

¶ 10   By 2015, plaintiff and Kulik's marriage had broken down. Around March 2015, plaintiff retained attorney Howard London to represent her in the divorce proceeding. Plaintiff gave London all her estate documents, including both the 2004 and 2011 Trusts. According to plaintiff, she recalled London "being very clear," when he reviewed the 2004 Trust, that, "Well, Tammy, this that [sic] would have held up in court somehow but you revoked it."

¶ 11   Plaintiff testified that this was the first inkling she ever had that Much Shelist had a made a mistake during its representation of her. London advised plaintiff to speak with a legal malpractice attorney.

¶ 12   So in May 2015, she contacted defendants to investigate whether she had a viable claim against Much Shelist. Plaintiff and defendants entered into an hourly retainer agreement in which defendants would "provide arbitration services concerning Much Shelist's conduct in your trust and estate planning matters. We will investigate any potential claim(s) against Much Shelist with the purpose of initiating and participating in ADR proceedings related to said claims."

¶ 13   During the initial investigation, the Spellmire defendants developed their preliminary opinion that plaintiff may have a claim. However, there was some question about when the limitations and repose periods would expire. Given that the legal work under review (Much Shelist's work) took place in 2011, the Spellmire defendants recognized that they would almost certainly draw a motion to dismiss based on the two-year statute of limitations for legal malpractice. See 735 ILCS 5/2-13-214.3(b) (West 2022).

¶ 14   According to plaintiff, in June 2015, she met with defendants about her case. At the meeting, they allegedly told her that she had a viable arbitration claim against Much Shelist and "would wait to file the arbitration case until after my divorce was final because according to Spellmire, I had not suffered damages yet." In late July, plaintiff informed the firm that

"[b]etween the legal fees for my divorce and now with Spellmire law re Much Shelist, I'm becoming financially overwhelmed and this is still very early in both cases." Tim McInerney, an associate assigned to plaintiff's case, responded as follows:

> "As George suggested yesterday, we think it's best to see how the property is treated in the divorce, then evaluate whether you want to proceed against Julia/Much for the possible loss of the house and your attorney fees trying to correct the problem. The statute of limitations for such an action would likely expire in March of 2017 (two years after you hired Howard and six years after the meeting where the revocation took place).
>
> Regarding legal fees, now that we have reviewed the documents, formed an opinion about possible time limitations, and received an opinion from Katarinna as to whether there was negligence, we can basically settle into a holding pattern while we await the outcome of the divorce. This will greatly reduce or eliminate our attorney fees until there is a development in the divorce or if you ask us to assist with anything else."

¶ 15    Kulik finally filed for divorce in December 2015.

¶ 16    In July 2016, plaintiff updated defendants: "It's been about a year since I worked with you and George regarding my potential case against Much Shelist. My divorce will hopefully be finalizing shortly and therefore I want to review the written basis and strength for my claim to see where to go from here." McInerney responded:

> "It's nice to hear from you. I can certainly put our assessment into a memo for you. I believe where we left off, the big question was how the Deming house would be treated in the divorce because if you managed to keep the house, even though it was looking unlikely, that would reduce or eliminate your damages. Is there an update on the disposition of the house or is it still too soon to say?"

Plaintiff could only tell McInerney that "the effort to settle the divorce case is ongoing." While she was interested in seeing the memorandum, she ended the email by reiterating that "I am not asking you to do any additional work at this time."

¶ 17    In early November 2016, the court approved plaintiff and Kulik's marital settlement agreement. While she maintained ownership of the Deming Property, she only did so after having to pay Kulik half its appraised value (approximately $750,000)—well over the amount agreed to by the couple when they first purchased it.

¶ 18    The next time plaintiff spoke with the Spellmire defendants was in April 2017. At this point, she wanted them to accept the case on a contingency fee in lieu of their prior hourly agreement. They declined, and plaintiff sought other representation in May 2017. After an unsuccessful mediation, plaintiff filed the present malpractice claim against the Spellmire defendants. In her complaint, plaintiff alleged that defendants breached the duty of care by failing to timely file a claim against Much Shelist and failing to adequately advise her on the limitations period of said claim. She also alleged excessive billing.

¶ 19    Defendants moved to dismiss. Curiously, in seeking dismissal, their position was that plaintiff had until June 2018 to bring her claim against Much Shelist. But because she had fired them while she still had a viable claim, they contended that they could not be the proximate cause for any harm stemming from the failure to bring the claim; she still could have hired another lawyer. The court denied the motion to dismiss and set a discovery schedule.

¶ 20    As part of discovery, defendants deposed plaintiff. During her deposition, as we quoted above, plaintiff explained that she clearly understood the effect of revoking the 2004 Trust at the time. Based on this "admission," the Spellmire defendants moved for summary judgment. Unlike their position in the motion to dismiss, they now argued that they could not have proximately

caused plaintiff's injury because the limitations period for the Much Shelist claim expired *before she contacted them* in 2015. Specifically, they now contended that plaintiff was aware of her injury—the fact that she did not have sole ownership of the Deming Property—the instant she revoked the trust on March 8, 2011. Thus, the limitations period against Much Shelist began running that day and expired in March 2013.

¶ 21    The circuit court entered summary judgment for the Spellmire defendants, finding that:

"Plaintiff's own testimony under oath establishes that the statute of limitations for any claim she had against Much Shelist's legal representation was triggered on March 8, 2011, when Plaintiff revoked the trust. Plaintiff admits that when she revoked the trust, she knew that the Deming Property would not be distributed as she wished in the event of divorce because she knew '[what] revoking a trust meant. And that I was screwed, basically', stated that she 'felt like I was going to vomit' when signing the revocation, admitted signing the document caused her to break 'out in a sweat', and she stated that she knew 'whatever I had planned for the Deming house was not going to happen.' "

¶ 22    Based on this finding, the court held that the limitations period for plaintiff's claim against Much Shelist ran almost two years before she retained defendants. "Thus, the retention of Defendants was too late and Plaintiff could not have prevailed [on] her claim against Much Shelist no matter what Defendants did. As such, Plaintiff cannot establish that 'but for' Defendants' conduct, she would have been successful." The court then granted summary judgment on plaintiff's malpractice claim—leaving only her excessive billing count.

¶ 23    With the majority of her claim terminated, plaintiff voluntarily dismissed the excessive-billing claim, leaving the order of summary judgment as a final and appealable judgment. Plaintiff timely appealed.

¶ 24                                ANALYSIS

¶ 25     Summary judgment is appropriate where the pleadings, depositions, affidavits, and admissions on file show that there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. *Suburban Real Estate Services, Inc. v. Carlson*, 2022 IL 126935, ¶ 15. We review the evidence liberally in favor of the non-movant—here, plaintiff. *Chatham Foot Specialists, P.C. v. Health Care Services Corp.*, 216 Ill. 2d 366, 376 (2005). Our review is *de novo*. *Carlson*, 2022 IL 126935, ¶ 15.

¶ 26     To succeed in a legal malpractice claim, the plaintiff must show not only a duty of representation and a breach of that duty; she must also prove that the breach of duty proximately caused her damages. *Id*. ¶ 17. Legal malpractice actions are unique in that they usually require an inquiry into the actions of the defendant law firm in the underlying litigation or transaction at issue—what we often call a "case within a case." *Id*. ¶ 19. Here, what the defendant law firm is alleged to have done negligently is to not sue yet another law firm for legal malpractice. It is not just a "case within a case" but a legal malpractice action within a legal malpractice action. So here, the question is whether the Spellmire defendants were negligent in failing to sue Much Shelist for its alleged malpractice in revoking the 2004 trust. More specifically, our question is whether any potential suit against Much Shelist was time-barred by the time plaintiff walked in the door of the Spellmire law firm for the first time in 2015.

¶ 27     The Spellmire defendants' position, which carried the day in the circuit court, is this: they could not have timely sued Much Shelist, because plaintiff knew of her injury (the loss of sole ownership interest in the Deming property) and that it was the result of negligent legal advice back in March 2011; the limitations period thus expired two years later in March 2013; and plaintiff did not even meet with the Spellmire defendants until 2015. Thus, even if they were

negligent in not filing suit, plaintiff suffered no damages—because that lawsuit against Much Shelist would have been immediately dismissed as time-barred. See *Carlson v. Michael Best & Friedrich LLP*, 2021 IL App (1st) 191961, ¶ 82 (no legal malpractice claim when client engaged defendants after limitations period of underlying claim had expired).

¶ 28 There is no debate here that an aggrieved client must bring an action for legal malpractice "within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2022). This limitations period incorporates the discovery rule, "which delays the commencement of the statutory period until the injured party knows or reasonably should know facts that would cause him or her to believe that their injury was wrongfully caused." *Michael Best & Friedrich LLP*, 2021 IL App (1st) 191961, ¶ 81.

¶ 29 Injury and wrongful cause are different elements; one must know not only of an injury but that the injury was wrongfully caused. *Carlson v. Fish*, 2015 IL App (1st) 140526, ¶ 23; *LaManna v. G.D. Searle and Co.*, 204 Ill. App. 3d 211, 217-18 (1990). " 'A person knows or reasonably should know an injury is 'wrongfully caused' when he or she possesses sufficient information concerning an injury *and its cause* to put a reasonable person on inquiry to determine whether actionable conduct is involved.' " (Emphasis added.) *Zweig v. Miller*, 2020 IL App (1st) 191409, ¶ 26 (quoting *Fish*, 2015 IL App (1st) 140526, ¶ 23).

¶ 30 The Spellmire defendants insist that these conditions were met in March 2011, when plaintiff revoked her 2004 trust after being told by her lawyer at Much Shelist that the 2004 trust was invalidly drafted and unenforceable in court. At that point, they say, she knew of her injury—that she would not have full and exclusive ownership of the Deming property—and that her injury was wrongfully caused.

¶ 31    We agree with the first part but not the second. That is, we agree that plaintiff knew she was injured as of March 2011. An "injury" for these purposes is " 'a pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission.' " *Carlson*, 2022 IL 126935, ¶ 17 (quoting *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). To be sure, plaintiff knew that she did not have full ownership of the Deming property in March 2011. But did she know of her injury's wrongful cause at that time? Based on this record at this stage, our answer is a clear no.

¶ 32    Again, the limitations period begins not only when a plaintiff knows of her injury but when she also knows that her injury was " 'caused by the lawyer's negligent act or omission.' " *Id.* (quoting *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306). Plaintiff's theory is that the "negligent act or omission" that "caused" her to lose full ownership of the Deming property was the revocation of the 2004 trust in March 2011.

¶ 33    But plaintiff did not know that this was the cause in March 2011. She knew she was revoking the 2004 trust, obviously—but she did *not* know that the effect of that revocation was to defeat her claim to exclusive ownership of the Deming property. She was told something very different by her Much Shelist lawyer. She was told that she never *had* exclusive possession of the Deming property, because the 2004 trust was unenforceable from the start. She was told, in other words, that the negligent act or omission that "caused" her to lack exclusive ownership of the Deming property was poor legal work performed in 2004 in drafting the 2004 trust. When plaintiff signed that revocation seven years later, she did not think she was causing her claim to exclusive ownership to disappear; she was told it was already gone.

¶ 34    So while it is true, as the Spellmire defendants insist, that plaintiff knew in March 2011 that she did not have exclusive ownership of the Deming property, she did not know *why* yet.

She did not know what *caused* that injury. She thought she did; based on the Much Shelist's lawyer's advice, plaintiff thought the cause was a negligently drafted 2004 trust. But she did not know what she now alleges is the *real* reason—the *revocation* of the 2004 trust in March 2011. She did not know that this particular act was the cause of her losing full ownership.

¶ 35    Nor did she know in March 2011 that this cause was "wrongful." She trusted her Much Shelist lawyer, as she had every right and reason to do; it would stand the law on its head to suggest otherwise. She had no reason to suspect that her Much Shelist lawyer was giving her (allegedly) negligent advice. She obviously placed her faith in that lawyer when she revoked the 2004 trust, believing that she was simply revoking a document that had no legal effect, anyway.

¶ 36    Things came to a head in 2015, when she conferred with her divorce lawyer, London. He told her that the 2004 trust would have aided her claim to exclusive ownership of the Deming property in the divorce—that it *would* have held up in court—simply put, that she never should have revoked that 2004 trust. Until that moment, plaintiff testified, she had no inkling or reason to believe that the Much Shelist lawyer actually gave her the (allegedly) wrong advice. It was at that moment that plaintiff knew the true "cause" of her injury, and that it was "wrongful."

¶ 37    The Spellmire defendants cite decisions and go to great lengths to emphasize that it does not matter that the plaintiff knows *who* wrongfully caused the injury, only that the injury was wrongfully caused. True, but that does not change anything we have said. The "who" aside, plaintiff did know *what* caused her injury—which negligent act or omission—until her meeting with London in 2015. At that point, after conferring with London, plaintiff first realized that the cause of her problem was not (allegedly) negligent legal work in 2004—it was (allegedly) negligent legal advice in 2011, which caused her to revoke her claim to full ownership of the

Deming property. It was then and only then that she discovered the true "wrongful cause" of her "injury," at least under plaintiff's theory of case.

¶ 38     Based on the discovery rule embodied in the statute of limitations for legal malpractice claims, the two-year limitations period for a claim against Much Shelist thus did not begin running until that day in 2015 when plaintiff received this information from London. At the time in 2015 that plaintiff first approached the Spellmire defendants about a possible claim against Much Shelist, a potential lawsuit was not time-barred. It was thus error to hold, as a matter of law, that plaintiff could not prove a proximate causal relationship between the Spellmire defendants' alleged breach of duty and her damages.

¶ 39     Though we have liberally sprinkled in the word "allegedly" to make this point, we emphasize that we are at the stage of summary judgment, where we draw all reasonable inferences in the record in plaintiff's favor. We express no opinion on the merits. We do not mean to suggest that any law firm or lawyer herein did or did not commit malpractice; we make no comment on the various legal interpretations of the 2004 trust and its enforceability in court. None of those questions are before us. And we understand there is much more to be said about the interactions between plaintiff and Much Shelist, as well the interactions between plaintiff and the Spellmire defendants. We are taking plaintiff's theory as we find it without comment on the merits. We only hold here that summary judgment on the stated ground was inappropriate.

¶ 40                                    CONCLUSION

¶ 41     The judgment of the circuit court is reversed. The cause is remanded for further proceedings.

¶ 42     Reversed and remanded.