2022 IL App (1st) 200724-U

No. 1-20-0724

Order filed June 30, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| WILLIAM CARLSON and WILLIS CAPITAL, LLC, | ) ) | Appeal from the Circuit Court of |
| Plaintiffs-Appellants, | ) ) | Cook County. |
| v. | ) ) | 16 L 383 |
| THOMAS CRONIN, AARON L. DAVIS, LELAND W. HUTCHINSON, JR., DANIEL J. KELLEY, and CRONIN & COMPANY LTD, | ) ) ) ) | Honorable Daniel J. Kubasiak, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's grant of summary judgment in favor of the Cronin defendants on count II of the amended complaint for legal malpractice brought by William Carlson.

¶ 2    William Carlson (Carlson) entered into a settlement agreement with his former business partners Thomas Hutchinson (Hutchinson) and Owen O'Neill (O'Neill). Under the terms of the agreement, Carlson agreed to sell them his ownership interest in Belvedere Trading LLC. Later,

Carlson sought to reopen and set aside the agreement, arguing that it was procured by fraud and malfeasance on the part of his former business partners. Having been unsuccessful in his efforts to have the agreement set aside, Carlson filed a series of legal malpractice claims against various law firms and lawyers who advised him in connection with the agreement. See *Willis Capital LLC v. Belvedere Trading LLC*, 2015 IL App (1st) 132183; *Carlson v. Fish*, 2015 IL App (1st) 140526 (*Carlson I*); and *Carlson v. Michael Best & Friedrich LLP*, 2021 IL App (1st) 191961 (*Carlson II*). This is the latest appeal in that series.[1]

¶ 3                                                 I. BACKGROUND

¶ 4        In 2002, Carlson founded Belvedere Trading LLC (Belvedere) for the purpose of trading S&P 500 equity index options. Carlson owned his interest in Belvedere through another limited liability company, Willis Capital LLC, of which he was the sole owner and member. Hutchinson and O'Neill eventually joined Belvedere as partners. *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 5. "Carlson was the sole managing member and held about a 62% membership interest; O'Neill held about a 25% interest and Hutchinson held the remaining 13% interest." *Carlson I*, 2015 IL App (1st) 140526, ¶ 6. However, by 2004, O'Neill and Hutchinson were managing members and owned an equal 33.3% interest along with Carlson. *Id.*

¶ 5        In 2005, Carlson took a leave of absence from actively managing Belvedere due to health reasons. When Carlson returned to the company in 2006, "he had a falling out with O'Neill and Hutchinson over numerous issues, including profit distribution and management." *Id.* ¶ 7.

¶ 6        In March 2007, Carlson retained Attorneys Shawn M. Collins and David J. Fish of the Collins Law Firm, P.C. to represent him in his dispute with O'Neill and Hutchinson; Fish later formed the Fish Law Firm while continuing to represent Carlson; the two law firms are collectively

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon entry of a separate written order.

referred to as "Collins." *Id.*

¶ 7    In May 2007, Collins filed a request for arbitration on behalf of Carlson with the Chicago Board Options Exchange (CBOE), as provided for in Belvedere's operating agreement. *Carlson II*, 2021 IL App (1st) 191961, ¶ 6. In addition, Collins filed a complaint for injunctive relief in the circuit court seeking to dissolve Belvedere and compel a purchase of Carlson's interest in the company for fair value. *Id.* Hutchinson and O'Neill refused Carlson's request to obtain an appraisal of Belvedere and also denied his request for access to the company's books and records.

¶ 8    In February 2008, the parties agreed to mediate their dispute. Carlson failed to obtain an independent appraisal of his interest in Belvedere prior to the mediation, but in an e-mail to Collins, he estimated that by the end of 2009, the company could be sold for $100 million. *Id*. ¶ 7; *Carlson I*, 2015 IL App (1st) 140526, ¶ 8.

¶ 9    Unbeknownst to Carlson, and prior to the mediation, O'Neill and Hutchinson employed an accounting firm to conduct an appraisal of Belvedere to determine a market value of Carlson's one-third interest in the company. *Carlson II*, 2021 IL App (1st) 191961, ¶ 7; *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 8. The accounting firm developed statistical models to estimate this value and presented the models to O'Neill and Hutchinson. After receiving the statistical models, O'Neill and Hutchinson directed the accounting firm not to prepare a written report of its findings and to stop further work on the appraisal. None of this was disclosed to Carlson.

¶ 10    At the mediation, Carlson again asked for an appraisal of Belvedere. In response, Hutchinson and O'Neill claimed that an appraisal was unnecessary as they were not interested in selling their interests in Belvedere. *Carlson II*, 2021 IL App (1st) 191961, ¶ 8; *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 9. The mediation resulted in Carlson agreeing to sell his interest in Belvedere for $17.5 million. The three owners signed a document delineating the terms of the sale,

which were subsequently memorialized in a settlement agreement signed by them in March 2008. *Carlson II*, 2021 IL App (1st) 191961, ¶ 9; *Carlson I*, 2015 IL App (1st) 140526, ¶ 8.

¶ 11    The settlement agreement provided in part that it represented:

"a complete compromise of the controversy between the parties involving disputed issues of law and fact, and that each party fully assumes the risk that the facts or law may be other than they believe"; the parties agree "that they are not fiduciaries to each other with respect to the negotiations, preparation and execution of" the agreement; and the parties were advised by their respective attorneys and advisors as to the merits of the agreement and that no party was relying on any promise, representation or disclosure of any other party.

¶ 12    In addition, the agreement contained a fee-shifting provision providing that attorney fees and expenses could be awarded to a prevailing party in "an action brought by any party to enforce the terms" of the agreement.

¶ 13    In September 2008, approximately six months after the mediated settlement, Carlson exchanged e-mails with Shawn Collins expressing his belief that O'Neill and Hutchinson had fraudulently tricked him into selling his interest in Belvedere for less than its true value. *Carlson II*, 2021 IL App (1st) 191961, ¶ 11; *Carlson I*, 2015 IL App (1st) 140526, ¶ 9. Carlson and Shawn Collins discussed the possibilities of petitioning the circuit court to reopen and set aside the settlement agreement, and of filing a fraud action against O'Neill and Hutchinson.

¶ 14    In November 2008, Carlson contacted a college friend Chris Parker, who was an attorney with the law firm of Michael Best & Friedrich, LLP (Michael Best). Carlson asked Parker to review the settlement agreement and evaluate whether he had any viable claims against his former business partners. *Carlson II*, 2021 IL App (1st) 191961, ¶ 12. Carlson also began expressing dissatisfaction with the legal representation he received from Collins.

¶ 15 On November 19, 2008, Carlson met with attorneys from the law firm of Drinker, Biddle & Reath, LLP (Drinker), to review the settlement agreement and discuss possible fraud claims against his former business partners. *Id.* ¶ 13; *Carlson I*, 2015 IL App (1st) 140526, ¶ 16. Carlson claimed that during these discussions, questions were raised concerning whether the legal services he received from Collins had been substandard. Carlson maintained that this was the first time he became aware of a possible legal malpractice claim against Collins.

¶ 16 From August 18, 2010, through September 16, 2010, Carlson officially retained the law firm of Michael Best for consultation regarding a potential legal malpractice action against Collins. Parker advised Carlson that a legal malpractice action against Collins "may be tough in the face of the statute of limitations." *Carlson II*, 2021 IL App (1st) 191961, ¶ 14. Parker informed Carlson that the applicable statute of limitations for a legal malpractice claim was two years from the date Carlson should have learned of the alleged malpractice. *Id.*

¶ 17 On November 11, 2010, Carlson retained the law firm of Cronin & Co., Ltd (Cronin). In the course of their research, Carlson and counsel from Cronin contacted the accounting firm which had conducted the pre-mediation appraisal of Belvedere. They discovered that unbeknownst to Carlson, O'Neill and Hutchinson had employed the accounting firm to conduct a pre-mediation appraisal of Belvedere to determine a market value of Carlson's interest in the company. *Id.* ¶ 15; *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 12.

¶ 18 Cronin filed a legal malpractice complaint on behalf of Carlson against Collins on November 18, 2010. *Carlson II*, 2021 IL App (1st) 191961, ¶ 16; *Carlson I*, 2015 IL App (1st) 140526, ¶ 17; *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 12. In the complaint, Carlson alleged that Collins failed to obtain an appraisal of Belvedere and "thereby permitted their clients to settle without any appropriate advice and counsel as to what was being surrendered." *Willis*

*Capital LLC,* 2015 IL App (1st) 132183, ¶ 12. Cronin subsequently filed an amended legal malpractice complaint against Collins on February 23, 2011. *Carlson II*, 2021 IL App (1st) 191961, ¶ 16. In March 2011, Collins moved to dismiss the amended complaint on statute of limitations grounds.

¶ 19    On May 17, 2011, Cronin filed a request for arbitration on Carlson's behalf with the CBOE. *Id*. ¶ 17. Carlson alleged that his former business partners were fiduciaries and had committed fraud by withholding information regarding Belvedere's value. O'Neill and Hutchinson filed a motion to dismiss the arbitration.

¶ 20    On July 13, 2011, Carlson and Collins entered into a tolling agreement whereby Carlson voluntarily dismissed his amended legal malpractice complaint against Collins, without prejudice. *Id*. ¶ 18. The tolling agreement provided that if the arbitration action was "resolved on or after April 13, 2012, [Carlson] shall have a period of 90 days after resolution of the arbitration to refile this action. If the arbitration is resolved before April 13, 2012, the one-year refiling provision in 735 ILCS 5/2-1009 shall remain intact." *Id*. The tolling agreement further provided that it "shall not act to revive any cause(s) of action already barred by the statute of limitations when the legal malpractice complaint was filed on November 18, 2010." The CBOE eventually dismissed the arbitration with prejudice on March 5, 2012. *Id*. ¶ 19; *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 12.

¶ 21    On March 26, 2012, pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2012)), Carlson through Cronin filed a petition, and subsequent amended petition, in the circuit court, seeking to "reopen" the settlement agreement. *Carlson II*, 2021 IL App (1st) 191961, ¶ 19; *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶¶ 1, 13. The amended petition alleged the following: O'Neill and Hutchinson had fraudulently concealed information

regarding the value of Belvedere prior to execution of the settlement agreement; the provision in the settlement agreement waiving fiduciary duties was unenforceable; and the CBOE's dismissal of the arbitration had no preclusive effect on the petition. *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 1.

¶ 22    O'Neill and Hutchinson filed a motion to dismiss the amended petition pursuant to section 2-619.1 of Code (735 ILCS 5/2-619.1 (West 2012)). They argued that the amended petition was barred by the two-year statute of limitations applicable to section 2-1401 petitions. They further argued that the amended petition was barred by the CBOE's order dismissing the arbitration and by the release contained in the settlement agreement. They also contended that the amended petition was barred by Illinois Supreme Court Rule 201(b)(3) (eff. July 1, 2014), which protects the identity of consultants, their opinions, and work product from discovery, except under "exceptional circumstances." *Carlson II*, 2021 IL App (1st) 191961, ¶ 19; *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 14.

¶ 23    On June 7, 2013, the circuit court dismissed the amended petition with prejudice. *Carlson II*, 2021 IL App (1st) 191961, ¶ 20; *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 15. The court determined that the amended petition failed to state a claim for rescission of the settlement agreement because it failed to allege sufficient facts showing that Carlson intended to return the $17.5 million. The court also determined that the amended petition failed to state a claim for fraudulent concealment in light of the nonreliance and mutual release clauses contained in the settlement agreement. The court further found that Carlson failed to exercise due diligence in the 2007 litigation where he never tried to obtain an appraisal of Belvedere prior to the mediation, even though he was able to produce an appraisal in the present litigation based on documents available at the time of the settlement. *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 15. The

court also determined that the amended petition was barred by the doctrine of *res judicata* and that Illinois Supreme Court Rule 201(b)(3) (201 Ill.2d R. 201(b)(3)) protected the accounting firm's appraisal from disclosure as consultant work product. *Id.*

¶ 24    O'Neill and Hutchinson subsequently filed a petition seeking attorney fees and costs pursuant to the fee-shifting provision in the settlement agreement. Carlson filed a notice of appeal on July 5, 2013. On January 6, 2014, the circuit court awarded O'Neill and Hutchinson $172,391.75 in fees and costs. *Willis Capital LLC,* 2015 IL App (1st) 132183, ¶ 16. Carlson filed a second notice of appeal on January 31, 2014, challenging the court's fee award. This court consolidated the two appeals (*Willis Capital* appeal).

¶ 25    While the *Willis Capital* appeal was pending, Cronin refiled Carlson's legal malpractice complaint against Collins on July 5, 2013. *Carlson I*, 2015 IL App (1st) 140526, ¶ 17. The circuit court subsequently granted Collins's motion to dismiss the refiled complaint pursuant to section 2-619(a)(5) of the Code (735 ILCS 5/2-619(a)(5) (West 2012)), finding it was time-barred by the two-year statute of limitations applicable to legal malpractice actions (735 ILCS 5/13-214.3(b) (West 2012)). The court determined that the cause of action accrued at the time Carlson knew he had been injured, which the court found was no later than September 2008. The court found that by November 12 or 13 of 2008, Carlson had identified his former business partners as the wrongful cause of his injury, which put him on inquiry notice that a cause of action had accrued. *Id*. at 19. The court concluded that because Carlson's initial legal malpractice complaint was filed on November 18, 2010, which was more than two years after his cause of action accrued, the complaint was time-barred by the two-year statute of limitations applicable to legal malpractice actions. *Id*. Carlson appealed (*Carlson I* appeal).

¶ 26    Carlson retained the law firm of Michael Best for a second time on February 27, 2014, to

act as a consultant in connection with his appeals in *Willis Capital* and *Carlson I*.

¶ 27    On appeal in *Willis Capital*, this court affirmed in part and reversed in part. We affirmed the circuit court's dismissal of Carlson's amended petition to reopen the settlement agreement. We determined that even if Carlson's former business partners owed him a fiduciary duty and fraudulently concealed the results of the appraisal from him, this did not relieve Carlson of his duty to exercise due diligence in discovering the appraisal value of his interest in Belvedere prior to the mediation and settlement. *Id.* ¶¶ 20-23. We reversed the court's judgment with respect to the award of attorney fees and costs pursuant to the fee-shifting provision in the settlement agreement. We determined that the provision was intended to award attorney fees and costs to prevailing parties who sought to enforce the terms of the settlement agreement, as opposed to parties, such as O'Neill and Hutchinson, who sought to defend the terms of the agreement in response to a section 2-1401 petition to invalidate the agreement. *Id.* ¶¶ 24-25.

¶ 28    On appeal in *Carlson I*, we affirmed the circuit court's dismissal of Carlson's legal malpractice complaint against Collins. *Carlson I*, 2015 IL App (1st) 140526, ¶¶ 4, 48. We agreed with the circuit court that the complaint was time-barred by the two-year statute of limitations found in section 13-214.3(b) of the Code. We found that correspondence between Carlson and Collins, which began in September 2008 and continued through November 2008, along with certain judicial admissions made by Carlson, showed that he was aware he was wrongfully injured by his former business partners no later than November 13, 2008, and probably as early as September 2008. *Id.* ¶¶ 28-33.

¶ 29    Carlson's second retention of Michael Best ended in May 2015, after Carlson decided not to file a petition for leave to appeal *Carlson I* to the Illinois Supreme Court. Carlson discharged Cronin in June 2015.

¶ 30    On January 13, 2016, Carlson filed a two-count complaint for legal malpractice in the circuit court against Michael Best, Cronin, and several attorneys associated with Cronin. *Carlson II*, 2021 IL App (1st) 191961, ¶ 28. Carlson filed an amended complaint on August 31, 2016. Count I of the amended complaint made allegations against Michael Best. Count II made allegations against Cronin and Cronin attorneys Aaron L. Davis, Leland W. Hutchinson, Jr., and Daniel J. Kelley (collectively, Cronin defendants).

¶ 31    The circuit court subsequently granted summary judgment in favor of Michael Best and we affirmed in *Carlson II*, 2021 IL App (1st) 191961, ¶ 109. In affirming the circuit court's decision we determined the following: Michael Best did not cause Carlson to lose any legal malpractice claims that he may have had against Collins because these claims were time-barred by the applicable statute of limitations prior to Carlson retaining Michael Best in August 2010; Michael Best did not cause Carlson to lose any potential legal malpractice claims against Drinker because these claims were still viable when Carlson retained successor counsel in November 2010; and Carlson cannot sue Michael Best for failing to inform him of a claim against Michael Best as there is no duty for a law firm to inform a client that he or she has a claim against it. *Id*. ¶ 107.

¶ 32    We also determined that the circuit court did not abuse its discretion in denying Carlson leave to file a second amended legal malpractice complaint where the proposed amendment concerned allegations that were time-barred by the applicable period of repose and Carlson failed to establish the first factor set forth in *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263 (1992), showing that the allegations would cure defects in the prior pleadings. *Id*. ¶ 106. We further determined that the court did not abuse its discretion in denying Carlson's motion to conduct additional discovery where he failed to support the motion with a Rule 191(b) affidavit. We finally concluded that the court did not abuse its discretion in declining to address arguments

Carlson raised in his motion for reconsideration as they were not only waived, but without merit. *Id.* ¶ 108.

¶ 33    The present appeal concerns count II of Carlson's amended legal malpractice complaint against the Cronin defendants. In this count, Carlson alleged in the alternative, that if it was determined that his claims against Michael Best were time-barred by the applicable statute of limitations, then the Cronin defendants breached the applicable standard of care by failing to advise him that he had potential legal malpractice claims against Michael Best, Drinker, and Collins. Carlson also alleged overbilling and failure to account for billed time. In response, the Cronin defendants filed a motion for summary judgment and attorneys Davis, Hutchinson, Jr., and Kelley, filed their own motion for summary judgment.

¶ 34    The circuit court entered an opinion and order on December 6, 2019, and a subsequent opinion and order on April 24, 2020, granting the motions for summary judgment on count II of Carlson's amended legal malpractice complaint. The court also denied Carlson's motions for leave to file second and third amended legal malpractice complaints. Carlson now appeals.

¶ 35    We address Carlson's claims starting with his contention that the circuit court erred in granting summary judgment in favor of the Cronin defendants. We provide additional facts in the analysis section where necessary to address specific issues.

¶ 36                                II. ANALYSIS

¶ 37                             A. Summary Judgment

¶ 38    "The purpose of summary judgment is to determine whether a genuine issue of material fact exists that would require a trial." *Hodges v. St. Clair County*, 263 Ill. App. 3d 490, 492 (1994). Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518 (1993). "A triable issue precluding summary judgment exists where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). Our review of a summary judgment order is *de novo*. *Id*.

¶ 39                                                    1. Drinker

¶ 40    Carlson first argues that the circuit court erred in granting summary judgment in favor of Cronin. Carlson contends that he established a *prima facie* case that Cronin violated the standard of care by failing to file a legal malpractice lawsuit against Drinker prior to expiration of the statute of limitations or by failing to obtain a tolling agreement.

¶ 41    Section 13-214.3 of the Code "sets forth two independent timing requirements for legal malpractice actions: the two-year statute of limitations in subsection (b) and the six-year statute of repose in subsection (c)." *Sorenson v. Law Offices of Theodore Poehlmann*, 327 Ill. App. 3d 706, 708 (2002); 735 ILCS 5/13-214.3(b), (c) (West 2014). We focus our attention on subsection (c) which provides that an action for damages based on tort, contract, or otherwise against an attorney arising out of an act or omission in the performance of professional services may not be commenced more than six years after the date on which the act or omission occurred. 735 ILCS 5/13-214.3 (c) (West 2014).

¶ 42    "In contrast to a statute of limitations, which determines the time within which a lawsuit may be commenced after a cause of action has accrued, a statute of repose extinguishes the action

after a defined period of time, regardless of when the action accrued." *Evanston Insurance Co v. Riseborough*, 2014 IL 114271, ¶ 16. When the repose period expires, the cause of action is extinguished and the plaintiff's right to bring the action is terminated. *Evanston Insurance*, 2014 IL 114271, ¶ 16. Statutes of repose begin to run "on the last date on which the attorney performs the work involved in the alleged negligence." *Snyder v. Heidelberger*, 2011 IL 111052, ¶ 18.

¶ 43 In this case, the last act or omission which gave rise to Carlson's potential claims of legal malpractice against Drinker occurred in October 2009, when Drinker purportedly failed to advise Carlson of the two-year statute of limitations regarding his claims against Collins. Thus, the six-year statute of repose started running in October 2009 and ended October 2015. The record shows that Carlson discharged Cronin in June 2015 and obtained new legal representation. Therefore, Carlson's legal malpractice claims against Drinker remained viable nearly four months after Cronin was discharged.

¶ 44 Our courts have recognized that when a plaintiff's cause of action remains viable at the time the attorney is discharged, it cannot be said that the action was lost due to the attorney's alleged negligence, since the action still existed at the time the attorney was discharged. See *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743, 755-56 (2008). Thus, as a matter of law, Cronin cannot be deemed a proximate cause of the loss of Carlson's legal malpractice claims against Drinker because these claims remained viable months after Cronin was discharged.

¶ 45 2. Individual Attorneys

¶ 46 Carlson next contends that he had viable legal malpractice claims against attorneys Aaron L. Davis, Leland W. Hutchinson, Jr., and Daniel J. Kelley, in their individual and personal capacities for failing to advise him about legal malpractice claims he had against Drinker. In support of this contention Carlson cites to Illinois Supreme Court Rule 721(b) (eff. July 1, 2003).

13

The rule provides in relevant pat that "[a]ny attorney who by act or omission causes the corporation, association, limited liability company, or registered limited liability partnership to act in a way which violates standards of professional conduct, including any provision of this rule, is personally responsible for such act or omission and is subject to discipline therefor." *Id.*

¶ 47 Our courts have determined that although the rules of professional conduct may be relevant to the standard of care in a legal malpractice claim, the rules, in and of themselves, do not establish liability in a legal malpractice case. *Vandenberg v. Brunswick Corporation*, 2017 IL App (1st) 170181, ¶¶ 33-34; *Nagy v. Beckley*, 218 Ill. App. 3d 875, 881 (1991).

¶ 48 In addition, we further note that it is well established that "[a] claim for legal malpractice requires (1) an attorney-client relationship, (2) a duty arising from that relationship, (3) a breach of that duty, and (4) actual damages or injury proximately caused by the breach." *Zweig v. Miller*, 2020 IL App (1st) 191409, ¶ 25. The record in this case shows that Carlson entered into an attorney-client relationship with Thomas Cronin and the Cronin law firm, but not the individual attorneys employed by the firm. This is evidenced by the November 19, 2010, engagement letter between Carlson and Cronin, which provided that although the law firm anticipated "using associate lawyers and perhaps other attorneys to prosecute this litigation," the firm would "remain primarily responsible for the prosecution of the litigation."

¶ 49 Moreover, not only was there not an attorney-client relationship between Carlson and any of the individual attorneys employed by the Cronin law firm -- no allegations of negligent conduct were asserted against the attorneys in their individual capacities. Therefore, we find that the circuit court properly granted summary judgment to attorneys Davis, Hutchinson, Jr., and Kelley, in their individual capacities.

¶ 50                                    3. Overbilling

¶ 51    Carlson next argues that Cronin breached the standard of care by overbilling him for its legal services. In his initial legal malpractice complaint, Carlson alleged that Cronin billed him in excess of $750,000, which he claimed was in breach of the attorney fee cap of $250,000 contained in the retainer agreement. In his amended complaint, Carlson alleged that Cronin billed him in excess of $750,000 and never provided him with an itemized bill or detailed statement of the work performed. Carlson claimed that this amount was "unreasonable, unnecessary, or otherwise unfair because under no circumstance would it cost in excess of $750,000 to work on two motions to dismiss, two appeals and initiate three legal proceedings."

¶ 52    Carlson maintains that the circuit court erred in finding that his claim for overbilling was time-barred, as a matter of law, by the two-year statute of limitations set forth in subsection (b) of section 13-214.3 of the Code (735 ILCS 5/13-214.3(b) (West 2014)). Subsection (b) provides that an action for damages "against an attorney arising out of an act or omission in the performance of professional services *** must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2014). For purposes of a legal malpractice action, a plaintiff is considered to be injured when he suffers a loss for which he may seek monetary damages. *Stevens v. McGuireWoods LLP*, 2015 IL 118652, ¶ 12.

¶ 53    The two-year statute of limitations applicable to legal malpractice actions incorporates the "discovery rule," which delays the commencement of the statutory period until the injured party knows or reasonably should know that he has been injured, and that the injury may have been wrongfully caused. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 77 (1995). The discovery rule was developed "to avoid mechanical application of a statute of limitations in situations where an individual would be barred from suit before he was aware that he was injured."

*Hermitage Corp.*, 166 Ill. 2d at 77-78.

¶ 54    "The limitations period in a legal malpractice case begins to run from the time the injured party knows or reasonably should know that he has suffered an injury which was wrongfully caused." *Brummel v. Grossman*, 2018 IL App (1st) 162540, ¶ 26. "There is no requirement that a plaintiff must discover the full extent of his or her injuries before the statute of limitations begins to run." *Hoffman v. Orthopedic Systems, Inc.*, 327 Ill. App. 3d 1004, 1010 (2002). "A person knows or reasonably should know an injury is 'wrongfully caused' when he or she possesses sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Carlson I*, 2015 IL App (1st) 140526, ¶ 23 (quoting *Hoffman*, 327 Ill. App. 3d at 1011). "At that point, the burden is upon plaintiff to inquire further as to the existence of a cause of action." *Hoffman*, 327 Ill. App. 3d at 1011. The question as to when a plaintiff knew or reasonably should have known of his injury, so as to trigger the statute of limitations, is ordinarily a question of fact; however, the issue may be determined as a matter of law where the undisputed facts allow for only one conclusion. *Butler v. Mayer, Brown & Platt*, 301 Ill. App. 3d 919, 922 (1998).

¶ 55    The central issue to be decided is when Carlson possessed sufficient information such that he knew or reasonably should have known that he was being overbilled. Carlson contends he was unaware of any claims of negligence related to overbilling until after he discharged Cronin in June 2015. Carlson asserts that the statute of limitations could not begin to run until sometime after June 2015, and thus, his initial legal malpractice complaint, which was filed in January 2016, was filed within the two-year statute of limitations.

¶ 56    Carlson argues that he is not seeking liability based on the fee cap being exceeded, but rather on fact that he was never provided with an itemized bill or detailed statement of work

16

performed. We find Carlson's arguments unpersuasive.

¶ 57    The fee cap provides an appropriate baseline. Once the attorney fee cap of $250,000 was exceeded, Carlson knew or reasonably should have known that any additional work beyond the fee cap for which he was billed, was not contemplated in the retainer agreement. The record contains evidence showing that by the end of 2011, and certainly no later than December 2013, Carlson possessed sufficient information such that he knew or reasonably should have known that not only had the fee cap been exceeded, but that he was not receiving itemized billing.

¶ 58    On January 18, 2012, Carlson sent Cronin an email and an attached spreadsheet showing that by the end of 2011, Carlson had paid Cronin $545,000 in fees.

¶ 59    On August 29, 2013, Carlson sent an email to Cronin stating in part: "I'm bringing [a] fees spreadsheet for where we currently are," "[w]e have to make more progress *** We need more eyes on this." On September 13, 2013, Carlson emailed Cronin stating in part: "One question is, what meaningful strides are we making? People we could be updating during these long breaks in the legal system. Pantle ruled in early June. It's been 100 days. *** We should have openly analyzed this already. Pantle ruled 100 days ago. That is a very long time."

¶ 60    On October 3, 2013, Carlson emailed Cronin stating: "This is a message to you … And you are in charge of this case. Oh yeah, its hugely important. When do you want to meet? Enough bulls***." On November 29, 2013, Carlson emailed Cronin stating in part: "[S]ince nov 2010, we are now in the 750k range for fees (including consultants, experts)." Then on December 17, 2013, Carlson sent Cronin an email and an attached spreadsheet showing that by August 2013, Carlson had paid Cronin $750,000 in fees, and stated that the "damage here is unmistakable."

¶ 61    This series of emails and spreadsheets, dating from January 2012 to December 2013, demonstrate that any injury from the alleged overbilling accrued possibly as early as the end of

2011, but no later than December 2013. By the latter date, Carlson clearly possessed sufficient information such that he knew or reasonably should have known that he was being overbilled by Cronin. By December 2013, Carlson possessed sufficient information of an injury from overbilling and its possible wrongful cause to put a reasonable person on inquiry to determine whether actionable conduct was involved.

¶ 62     Carlson, however, did not file his action against Cronin until January 13, 2016, more than two years after December 2013. Therefore, we find the circuit court did not err in finding that Carlson's claim against Cronin for overbilling was time-barred, as a matter of law, by the two-year statute of limitations set forth in subsection (b) of section 13-214.3 of the Code (735 ILCS 5/13-214.3(b) (West 2014)).

¶ 63                                    4. Expert Affidavit

¶ 64     Carlson next argues that the circuit court erred in striking the expert affidavit of Attorney Richard Lehman. Carlson submitted the affidavit in opposition to the Cronin defendants' motions for summary judgment. Carlson maintains that the affidavit provided admissible expert testimony.

¶ 65     There is a split of authority whether the standard of review for a circuit court's ruling on a motion to strike an affidavit in conjunction with a motion for summary judgment is *de novo* or abuse of discretion. See *Brettman v. Virgil Cook & Son, Inc.*, 2020 IL App (2d) 190955, ¶¶ 54-56 (discussing the split of authority). *De novo* consideration means that the reviewing court performs the same analysis that a circuit court would perform. *Bituminous Casualty Corp. v. Iles*, 2013 IL App (5th) 120485, ¶ 19. We believe that *de novo* review is the proper standard to apply here because we review the same documentary evidence, Lehman's affidavit, as did the circuit court. See *Independent Trust Corp. v. Hurwick*, 351 Ill. App. 3d 941, 952 (2004) (circuit court's determination based solely on documentary evidence reviewed *de novo*). In any event, we need

not attempt to resolve the issue here, as our finding would be the same under either standard of review.

¶ 66    "An affidavit submitted in the summary judgment context serves as a substitute for testimony at trial." *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 21. "The function of affidavits in summary judgment proceedings is to show whether the issues raised are genuine and whether each party has competent evidence to offer which tends to support his side of the issue." *Harris Bank Hinsdale, N.A. v. Caliendo*, 235 Ill. App. 3d 1013, 1025 (1992). With these principles in mind, we examine Lehman's affidavit to determine whether he raises sufficient genuine issues of material fact necessary to survive the Cronin defendants' motions for summary judgment.

¶ 67    In his affidavit, Lehman opined than an error was made in determining when the six-year statute of repose began to run. Lehman opined that the statute began to run as soon as the event giving rise to the legal malpractice occurred. According to Lehman, this event occurred in November/December 2008, when Drinker failed to advise Carlson of the date by which he had to file his legal malpractice suit against Collins. Lehman stated that the "November/December 2008 Drinker Biddle representation started the running of the statute of repose, and the statute of repose ran on Carlson's claim of malpractice against Drinker Biddle in November 2014, while Cronin still was representing Carlson."

¶ 68    Contrary to Lehman's averments concerning when the six-year statute of repose begins to run, our supreme court has determined that "[t]he period of repose in a legal malpractice case begins to run *on the last date* on which the attorney performs the work involved in the alleged negligence." (Emphasis added.) *Snyder*, 2011 IL 111052, ¶ 18. As previously mentioned, the last act or omission which gave rise to Carlson's potential claims of legal malpractice against Drinker occurred in October 2009, when Drinker allegedly failed to advise Carlson of the two-year statute

of limitations regarding his claims against Collins. Therefore, the six-year statute of repose started running in October 2009 and ended October 2015. As a result, Lehman's opinion on this issue does not create an issue of material fact precluding summary judgment in favor of the Cronin defendants.

¶ 69     Lehman next opined that the attorney fees Cronin charged Carlson were suspect and unreasonable. Lehman averred that Cronin charged Carlson over $750,000 in attorney fees without providing him with an itemized billing statement specifying how the fees were calculated, and the amount of time spent on various tasks by lawyers and paralegals. Lehman averred that a portion of the fees Cronin charged was for work on an appeal spanning the time between the January 2014 trial court judgment and the March 2015 appellate court opinion. Lehman opined that Carlson's fee claim was not filed outside of the limitation period.

¶ 70     Lehman's opinions on the reasonableness of the attorney fees incurred by Carlson all relate to Carlson's claim of overbilling, a claim which we have determined is time-barred, as a matter of law, by the two-year statute of limitations set forth in subsection (b) of section 13-214.3 of the Code (735 ILCS 5/13-214.3(b) (West 2014)). Therefore, Lehman's opinions here do not create an issue of material fact precluding summary judgment in favor of the Cronin defendants. See, e.g., *Xeniotis v. Cynthia Satko, D.D.S., M.S., P.C.*, 2014 IL App (1st) 131068, ¶ 74 (expert affidavit failed to raise question of fact with respect to motion for summary judgment). As a result, we find that the circuit court did not err in striking Lehman's affidavit.

¶ 71     For the reasons set forth above, we find that the circuit court did not err in granting summary judgment in favor of the Cronin defendants.

¶ 72                      B. Leave to File Third Amended Complaint

¶ 73     Carlson next contends that the circuit court should have granted him leave to file a third

amended legal malpractice complaint. Carlson argues that "[t]he amendment was timely because Cronin had time to conduct any discovery needed and this was the second time the claims were amended against Cronin so there was absolutely no reason [he] should be denied leave to amend."

¶ 74    Plaintiffs do not have an absolute right to amend a pleading. *Giles v. Parks*, 2018 IL App (1st) 163152, ¶ 24. The decision rests in the sound discretion of the circuit court. *Id*; *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 30. A circuit court abuses its discretion in denying leave to amend a pleading if granting leave to amend would further the ends of justice. *Insurance Benefit Group, Inc. v. Guarantee Trust Life Insurance Co.*, 2017 IL App (1st) 162808, ¶ 50.

¶ 75    Our supreme court has identified four factors reviewing courts should consider in determining whether a circuit court abused its discretion in denying leave to amend a pleading: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). "The party seeking leave to amend bears the burden of demonstrating that all four factors favor the relief requested." *United Conveyor Corp. v. Allstate Insurance Co.*, 2017 IL App (1st) 162314, ¶ 36.

¶ 76    We confine our analysis to the first *Loyola* factor because it is dispositive. If a party fails to establish this first factor, showing that the proposed amendment would cure the defective pleading, then the court need not proceed to consider the remaining three factors. *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 7 (2004).

¶ 77    Carlson's proposed third amended complaint merely rehashes the allegations against Cronin that were contained in count II of the amended complaint. The only differences between the two are found in paragraphs 154 and 155 of the proposed third amended complaint. Here,

Carlson alleges additional duties that he claims the Cronin defendants allegedly breached. However, the allegations against the Cronin defendants remain the same and are not supported or substantiated by any additional facts. In essence, there was nothing in the pleadings that the proposed amendment would have cured. Therefore, we find that the circuit court did not abuse its discretion in denying Carlson leave to file a third amended legal malpractice complaint.

¶ 78                                    III. CONCLUSION

¶ 79    We find that the circuit court did not err in granting summary judgment in favor of the Cronin defendants. We also find that the circuit court did not abuse its discretion in denying Carlson leave to file a third amended legal malpractice complaint.

¶ 80    Affirmed.